IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2021

## W. DOUGLAS HARRIS v. GARY MCCMICHAEL ET AL.

**Appeal from the Circuit Court for Knox County**
No. 2-688-14          William T. Ailor, Judge
_____

No. E2020-00817-COA-R3-CV
_____

The trial court found that Appellant, a Florida attorney, breached his fiduciary duty to Appellees, his clients, and disgorged Appellant of all fees paid by Appellees except for $5,000. Appellant appeals. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Circuit Court Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., joined. KRISTI M. DAVIS, J., not participating.

W. Douglas Harris, Panama City Beach, Florida, appellant, *pro se*.

James R. Moore, Knoxville, Tennessee, for the appellees, Gary McMichael and Lisa McMichael.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

Appellees, Gary and Lisa McMichael, reside in Tennessee. The instant lawsuit stems from representation provided to the McMichaels by Appellant W. Douglas Harris, a Florida attorney. In connection with a commercial real estate development in Florida, the McMichaels signed guarantees on certain loans for the Florida development, and then allegedly defaulted on those loans. This precipitated a lawsuit against the McMichaels by the bank and their former partners in the venture ("the Florida Litigation"). At the outset of the Florida Litigation, the McMichaels were represented by attorney Gregory D. Smith. Unfortunately, Mr. Smith fell ill prior to resolution of the Florida Litigation, and the McMichaels engaged Mr. Harris as their attorney.

Giving rise to the instant appeal, on October 30, 2014, Mr. Harris filed a complaint against the McMichaels in the Knox County Circuit Court ("trial court"), alleging a claim for breach of contract, quantum meruit, and bad check. In the complaint, Mr. Harris averred, *inter alia*, that: (1) he and Mr. McMichael entered into an attorney-client agreement on June 2, 2014, which provided for a $30,000 retainer and hourly fees charged at $350 per hour for attorney time and $100 per hour for legal assistant time; (2) the amount owed on the June 2 agreement had been paid in full; (3) the parties entered into an amended attorney-client representation agreement on August 25, 2015, which provided for the same hourly fees as the prior agreement and for a $30,000 retainer which was "deemed earned upon payment and non-refundable"; (4) Mr. Harris performed legal services pursuant to the amended agreement and incurred hourly fees equal to or in excess of the $30,000 retainer; (5) on August 15, 2015, Mr. McMichael tendered a check to Mr. Harris for $15,000 which was not honored when Mr. Harris presented it to the issuing bank; (6) the amended agreement provided for a lien on Mr. McMichael's real, personal, and intangible property for any unpaid balance; and (7) Mr. McMichael failed to pay the $30,000 owed.

On December 8, 2014, the McMichaels filed an answer and counter-complaint, in which they averred that: (1) they had paid Mr. Harris $41,775; (2) the fees Mr. Harris sought were not justified; (3) they did not issue any bad checks; (4) Mr. Harris "failed to properly document that he has earned the sums paid to him or that the amounts charged are ethical or reasonable"; (5) Mr. Harris "used his position of trust, and advantage as an attorney, to breach his original agreement with the [McMichaels] and improperly and unethically demand two later fee agreements, which included additional 'non-refundable' fees, and an hourly rate increase of $100.00 and 'liens' on assets"; and (6) Mr. Harris threatened to disclose the McMichaels' confidential information if he was not paid. The McMichaels requested that Mr. Harris be disgorged of the $41,775 they had paid.

The trial court heard the case on September 17, 2018. The evidence presented at the hearing showed that the parties entered into an "Attorney-Client Representation Agreement" ("the First Agreement"), with Mr. McMichael as the client. The First Agreement states that Mr. Harris, will represent him "in regard to Charter Bank's Motion for Summary Judgment Case # 2010 CA 2267. . . ." It further states, "[T]his agreement will allow Attorney to make a limited appearance just for the pending Motion for Summary Judgment scheduled for March 6, 2014," and "the Attorney may provide additional legal services to the Client on which the Attorney and client may subsequently agree." With respect to fees, the First Agreement provided: "The current standard hourly rate for attorneys is $250.00 and $100.00 for legal assistants. Time billed shall be in increments of one quarter of an hour." The First Agreement also required a $5,000 retainer, "deemed earned upon payment and non-refundable."

Pursuant to the First Agreement, on March 6, 2014, Mr. Harris appeared at the summary judgment hearing in the Florida Litigation. At the hearing, the judge recused

himself, and the hearing was continued. On March 12, 2014, Mr. Harris sent Mr. McMichael an email that stated:

> Please find attached my legal invoice. There is no money due. I did not charge you for any of my expenses in traveling back to Okaloosa County or for drafting the motion to disqualify Judge Brown. Thank you for the opportunity to be of assistance to you in this matter.  Good luck in the future.

The email included a block bill (which Mr. Harris calls a "skinny bill"), showing "20 hours @$250.00 = $5000.00" for "reviewing the Motion for summary judgment filed by Charter Bank, researching available defenses, writing a memorandum in opposition to MSJ[,] [t]raveling from Palm Beach County to Okaloosa County and attending the SJ hearing and preparing a motion for disqualification of Judge Brown."  It also stated, "Under the terms of our agreement this will comp[l]ete our agreement."  The statement did not provide quarter-hour itemization of Mr. Harris' work as contemplated in the agreements, *see further discussion infra*.

The hearing on the motion for summary judgment in the Florida Litigation was rescheduled to May 1, 2014. Mr. Harris informed Mr. McMichael that he would not appear at that hearing without further payment.  So, Mr. McMichael paid Mr. Harris $1,500 on April 30, 2014, and Mr. Harris represented the McMichaels at the May 1 hearing. Concerning the April 30, 2014 payment, the Statement of Evidence in the instant case provides:

> During the trial of this matter, [Mr. Harris] called Defendant, Gary McMichael, to the stand to testify. [Mr. McMichael] testified that on April 30, 2014, [Mr. Harris] demanded another payment of $1,500.00 or he would not appear at a Motion for Summary Judgment hearing, and which amount was paid by [Mr. McMichael]'s sister. [Mr. and Mrs. McMichael] never signed any other fee agreement or received a detailed billing statement for any of this money paid to [Mr. Harris] for work to be performed for this amount. There was another hearing on the Foreclosure suit scheduled for May 1, 2014, which [Mr. Harris] admits was scheduled without his participation.

> Additionally, [Mr. McMichael] testified that [Mr. Harris] demanded an additional $5,000.00 payment, which was supported by emails dated May 14 and 15, wherein [Mr. Harris] asked [Mr. McMichael] if he had made arrangements for the $5,000.00 payment and [Mr. McMichael] replied that he (was) considering options such as using an "AMX (sic) card" or paying by check as stated in emails dated May 15 and 16, 2014. [Mr. McMichael] further states, "I am relying on you for the long haul here to help me and my wife." [Mr. McMichael] sent a payment of $5,000.00 via Pay Pal to [Mr.

Harris] on May 16, 2014 at 22:27 (10:27 p.m.) which incurred a service charge of $275.00 to [the McMichaels].

(Parentheticals in original.)  On May 27, 2014, Mr. Harris sent a letter to Mr. McMichael. In relevant part, the letter states:

> When we met in late February, you were facing a hearing date of March 6, 2014, and needed to make sure that no money judgment would be entered that might affect your ability to obtain funding for your project in downtown Ft. Walton Beach.  You stated that you needed 60 days to complete that closing.  That date would have been May 1st, 2014.
>
> With that in mind, I prepared for and attended the hearing on March 6, 2014, and instead of arguing against Charter Bank's Motion for Summary Judgment, an opportunity presented itself to seek to have Judge Brown recuse himself and I drafted and filed a motion, . . . [which] was granted, and I had achieved your desired result. [1]
>
> ***
>
> Without my participation in the scheduling, another hearing was set on May 1st to hear Charter Bank's Motion for Summary Judgment.  You requested that I attend, and I prepared for that hearing and attended in front of Judge Flowers in Crestview.  After the hearing, Judge Flowers requested proposed orders, and I have reviewed Charter Bank's proposed order and have drafted and delivered to the judge my proposed order.  Both Charter Bank's and my proposed orders do not attach any money judgment to you or Lisa, thereby your desire not to have a money judgment against you whereby you can close on your new deal was accomplished.
>
> As far as the mediation on the 19th of May, you requested that I attend with you. . . .  After discussing the case with [opposing counsel], he stated that without your discovery, now due by the 31st of May, he would not be able to negotiate with you to reach a settlement and he thought that your attending would be a waste of time and money. . . .
>
> ***
>
> I agreed to assist you in your effort to give you more time to close your downtown deal, and I have accomplished that task and far more.  I am

---

[1] Mr. McMichael disputes that recusal of the judge in the Florida Litigation was his "desired result."

- 4 -

willing to discuss with you continued representation that would be based on a value[-]based billing with lost opportunity factored in. . . .

Attached to the May 27 letter was a "Statement for Professional Fees" for the period of March 7, 2014 through May 27, 2014. The statement showed 33.5 hours of work at $250 per hour for a total of $8,375. The statement concludes with "Thank you for the opportunity to represent you in this matter. Under the terms of our agreement this will conclude our agreement. Good Luck with the remaining issues in the case." Mr. McMichael responded by email, wherein he expressed his dissatisfaction with the level of communication from Mr. Harris.

The parties subsequently discussed Mr. Harris' further representation, and on June 4, 2014, Mr. Harris emailed Mr. McMichael, stating, "Attached please find fee agreement. Once we have it executed and I have the retainer, we can talk and I will do a detailed schedule and plan of attack."[2] Attached to the email was an "Amended Agreement" ("the Second Agreement"). The Second Agreement bore Mr. Harris' signature, was dated June 14, 2014, and provided for Mr. Harris "to represent [Mr. McMichael] in regard to Case # 2010 CA 2267, pending in Okaloosa County, Florida, and . . . the exclusive right to take all legal steps to represent the client's interests in those matters." It set attorney fees at $350 per hour, $100 more than charged under the First Agreement; provided for billing in one-quarter-hour increments; and required a $30,000 retainer fee "deemed earned upon payment and nonrefundable." On receipt of the Second Agreement, Mr. McMichael stated in email to Mr. Harris, "We need to talk today. Please call me." Mr. Harris replied by email, "Read my email. Once you have signed the agreement and sent the $30,000, we can talk." The parties executed the Second Agreement on June 10, and the McMichaels paid Mr. Harris the $30,000 in three $10,000 installments on June 10, June 18, and June 24, 2014.

On August 25, 2014, a few days before a scheduled motion hearing in the Florida Litigation, the parties executed yet another agreement, titled "Amendment to Attorney-Client Representation Agreement Dated in June 2014," (the "Third Agreement"). In relevant part, the Third Agreement provided:

> Client shall pay Attorney $30,000 for his services under this amended agreement. Client shall deliver $15,000 of said fee to Attorney upon execution of this contract or August 25th 2014, whichever is later, the remaining $15,000 shall be due by September 15, 2014 and will be deemed earned upon payment and nonrefundable. It is anticipated that said $30,000 will cover Fees and expenses up to and including the deficiency hearing on October 7, 2014.

---

[2] According to the Statement of Evidence, "[t]he uncontroverted testimony was that [Mr. Harris] failed to follow through with his promise and no such schedule or plan of attack was ever provided."

The Third Agreement provided for attorney fees of $350 per hour. On August 29, 2014, Mr. Harris appeared as counsel for the McMichaels at a hearing on several motions in the Florida Litigation. Mr. Harris requested a continuance, and stated to the court multiple times that he was not prepared. Correspondence from Mr. Harris to Mr. McMichael suggests that Mr. Harris continued representing the McMichaels through September 2014. On September 30, 2014, Mr. McMichael emailed Mr. Harris to inform him that the McMichaels were retaining other counsel, and stated, "I will get with you to resolve the bill and payment." On October 21, 2014, Mr. Harris withdrew as the McMichaels' counsel of record in the Florida Litigation.

It is undisputed that the McMichaels paid Mr. Harris a total of $41,500 and that Mr. Harris demanded an additional $30,000 under the Third Agreement. Prior to the hearing in the instant case, Mr. Harris tendered a statement alleging that the McMichaels owed a balance of $40,027.50, comprised of 50.2 hours of work by Mr. Harris and 33.3 hours of work by a paralegal from August 7, 2014, though October 24, 2014.

By order of June 21, 2019, the trial court held that Mr. Harris did not prove his bad-check claim. The trial court further held that Mr. Harris "procured agreements subsequent to the initial agreement through coercion," which rendered the subsequent agreements void. Finally, the trial court held that the doctrine of quantum meruit was inapplicable because the parties had express contracts. The trial court disgorged Mr. Harris of all fees and removed the liens on the McMichaels' property. In a subsequent order of January 7, 2020, the trial court granted the McMichaels discretionary costs of $1,537.60 for court reporter fees and $3,720 for expert witness fees.

On July 19, 2019, Mr. Harris filed a Motion to Alter or Amend the Judgment, wherein he asserted, *inter alia*, that the trial court "contradicted itself by finding that the fee agreements were voidable, and yet [q]uantum [m]eruit is not available in this case because there were fee agreements." In an amended order filed on January 3, 2020, the trial court held, "This court is of the opinion that [the McMichaels] were coerced as a result of the unethical conduct of [Mr. Harris][,] but, because there was consideration for the services to be rendered, the agreements are not void." On January 7, 2020, the trial court entered an order on Mr. Harris' motion to alter or amend, wherein it found that

> [w]hen considering all the evidence and weighing it accordingly, the court is of the opinion that [Mr. Harris] has failed to present any new evidence or law that the court should consider amending its ruling. However, the court is of the opinion that [Mr. Harris] did attend some hearings, was somewhat prepared for some of them, did correspond with opposing counsel and the [McMichaels], and should be compensated for some of his time. As the court stated, it is impossible for the court to make a clear determination as to the amount that the [Mr. Harris] should receive. As a result, the court is of the

opinion that [Mr. Harris] should receive the initial five thousand ($5,000.00) retainer for his services and that [his] Motion to Alter or Amend should be Denied in all other respects.

In response to the trial court's orders of January 3 and 7, Mr. Harris filed a second motion to alter or amend judgment on February 2, 2020, wherein he argued, *inter alia*, that "the trial court's rationale for disgorgement of fees is no longer sustainable after its finding that the fee agreements were valid contracts." By order of May 13, 2020, the trial court denied the motion. Mr. Harris filed his notice of appeal on June 11, 2020.

## II. ISSUES

Mr. Harris presents the following issues for review:

1. Does this Court have jurisdiction over this appeal, since [Appellant] filed a Second Motion to Alter or Amend Judgment based upon the trial court entering an Amended Judgment and the second Motion to Alter or Amend raised new issues related to the Amendment?
2. Did the trial court err in finding that [Appellant] breached his fiduciary duty to [Appellees] by requiring them to sign a vague initial Limited Appearance fee agreement and not giving them sufficient notice of his intention to terminate his representation?
3. Did the trial court err in finding that [Appellant] breached his fiduciary duty to [Appellees] by not compiling his billing records contemporaneously?
4. Did the trial court err in finding that [Appellant] breached his fiduciary duty by not sending out billing statements on a regular basis?
5. Did the trial court abuse its discretion by initially finding that there were no valid fee agreements and no quantum meruit available, and then amending its judgment to find that the fee agreements were valid but that Appellant was only entitled to $5,000.00 for his legal work?
6. Did the trial court err in holding that [Appellant] [v]iolated his [e]thical [d]uty in increasing his hourly rate and asking for a substantial retainer in the June 4, 2014 Attorney[-]Client Representation Agreement?
7. Did the trial court abuse its discretion by ordering disgorgement of attorney fees by [Appellant] where disgorgement is not an appropriate remedy under the facts and circumstances of this case?
8. Did the trial court err in ordering that [Appellant] disgorge attorney fees to both Gary and Lisa McMichael where [Appellant's] agreement was only with Gary McMichael and no evidence was presented at trial that Lisa McMichael directly paid any attorney fees?

- 7 -

## III. STANDARD OF REVIEW

We review the trial court's findings of fact *de novo* on the record of the trial court, accompanied by a presumption of the correctness of these findings, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Kelly v. Kelly***, 445 S.W.3d 685, 691–92 (Tenn. 2014). Contract interpretation is a question of law that we review *de novo* on the record, with no presumption of correctness. ***Guiliano v. Cleo, Inc.***, 995 S.W.2d 88, 95 (Tenn. 1999). The decision to award equitable relief is generally within the discretion of the trial court. ***Morrow v. Jones***, 165 S.W.3d 254, 258 (Tenn. Ct. App. 2004) (citing ***Early v. Street***, 241 S.W.2d 531, 536 (Tenn. 1951)). We review a trial court's discretionary decisions under the "abuse of discretion" standard of review. ***Lee Med., Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010).

## IV. ANALYSIS

Before turning to the substantive issues, we first note that the appellants are responsible for providing this Court with a record that is sufficient for review of their issues. ***Williams v. Williams***, 286 S.W.3d 290, 297 (Tenn. Ct. App. 2008) (citing Tenn. R. App. P. 24; ***McDonald v. Onoh***, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989)). Here, the appellate record contains no transcript of the September 17, 2018 hearing. When a transcript is not available, the Rules of Appellate Procedure require that appellants prepare a statement of the evidence that "convey[s] a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(c). Mr. Harris submitted a statement of the evidence to the trial court; however, by order of October 28, 2020, the trial court refused to adopt Mr. Harris' statement because it "is full of statements that are neither accurate, fair, nor complete, and include statements that were not evidence admitted in this case." Rather, the trial court adopted the factual findings in its January 3, 2020 amended order as the Statement of Evidence. ***Hall v. Hall***, 772 S.W.2d 432, 435 (citing Tenn. R. App. P. 24(c), (e) ("Any question as to the accuracy of a . . . statement of the evidence is to be submitted to and settled by the [t]rial [c]ourt, whose determination is conclusive absent extraordinary circumstances.")). In his appellate brief, Mr. Harris makes factual assertions that are not corroborated in the record.[3] Because this Court "may consider [only] those facts established by the evidence in the trial court and set forth in the record," Tenn. R. App. P. 13, we will not consider extraneous factual assertions that are not contained in the record or in the trial court's January 3, 2020 amended order. Furthermore, facts that are not ascertainable through a review of the Statement of Evidence in combination with the remainder of the record are presumed to favor Appellee. *See **Tanner v. Whiteco, L.P.***, 337 S.W.3d 792, 796 (Tenn. Ct. App. 2010) ("[I]n the absence of a transcript or statement of the evidence, we must conclusively presume that every fact

---

[3] For example, Mr. Harris states that his expert witness "testified that she had reviewed Appellant's billing statements and had not seen anything in the statements that appeared to reflect excessive or unreasonable billing." This was not part of her testimony as described by the Statement of Evidence.

admissible under the pleadings was found or should have been found favorably to the appellee." (quoting *In re Rockwell*, 673 S.W.2d 512, 516 (Tenn. Ct. App.1983); *Wilson v. Hafley*, 226 S.W.2d 308, 311 (Tenn. 1949); *Kyritsis v. Vieron*, 382 S.W.2d 553 (Tenn. Ct. App. 1964))); *see also Williams*, 286 S.W.3d at 297 ("[W]e must assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's factual findings." (quoting *Sherrod v. Wix*, 849 S.W.2d 780, 783 (Tenn. Ct. App. 1993))). With this in mind, we turn to Mr. Harris' arguments on appeal.

### A. Waiver of issues

In addition to the inclusion of facts not contained in the record, Mr. Harris' brief also fails to comply with certain briefing requirements as set out in the Rules of Appellate Procedure and the Rules of the Court of Appeals. Rule 27 of the Tennessee Rules of Appellate Procedure provides:

> The brief of the appellant shall contain . . . [a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on[.]

Tenn. R. App. P. 27(a)(7)(A). Furthermore, the Rules of the Court of Appeals require that "[w]ritten argument in regard to each issue on appeal shall contain . . . [a] statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found," Tenn. Ct. App. R. 6(a)(4), and "[n]o assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded," Tenn. Ct. App. R. 6(b); *e.g., Flowers v. Bd. of Prof'l Responsibility*, 314 S.W.3d 882, 899 (Tenn. 2010) ("Parties are required to provide citation and support identifying where in the record evidence can be found" as "judges are not like pigs, hunting for truffles buried in the record." (quotation omitted)). We have "held on several occasions that where a party in its brief on appeal has . . . set forth what he or she alleged to be facts without any citation to the record, this court is not under a duty to minutely search the record to verify these unsupported allegations." *Long v. Long*, 957 S.W.2d 825, 828 (Tenn. Ct. App. 1997).

Here, Mr. Harris' appellate brief contains only sporadic citations to the record. Indeed, there is a full page and a half in Mr. Harris' "Statement of the Facts" that contains no citations to the record. More significant, however, is Mr. Harris' failure to cite authority, which is required by Rule 27. In his discussion of issues 2, 4, 5, and 6, Mr. Harris cites no legal authority whatsoever. It is well settled that failure to cite authority for propositions in arguments submitted on appeal constitutes waiver of the issue. *E.g.*, *Cleveland Custom Stone v. Acuity Mut. Ins. Co.*, No. E2013-02132-COA-R3-CV, 2014 WL 2586374, at *8 (Tenn. Ct. App. June 10, 2014); *SecurAmerica Bus. Credit v. Schledwitz*, No. W2012-

02605-COA-R3-CV, 2014 WL 1266121, at \*14 (Tenn. Ct. App. Mar. 28, 2014); *McGarity v. Jerrolds*, 429 S.W.3d 562, 566 n.1 (Tenn. Ct. App. 2013); *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474 (Tenn. Ct. App. 2003); *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 105 (Tenn. Ct. App. 2001); *see also Forbess v. Forbess*, 370 S.W.3d 347, 355 (Tenn. Ct. App. 2011) ("[A] party's failure to cite authority for its arguments or to argue the issues in the body of its brief constitute a waiver on appeal."); *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (failure "to cite to any authority or to construct an argument regarding [a] position on appeal" constitutes a waiver of the issue); *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000) ("[F]ailure to comply with the Rules of Appellate Procedure and the rules of this Court waives the issues for review."). Therefore, those issues for which Mr. Harris has cited no legal authority, *i.e.*, issues 2, 4, 5, and 6, are deemed to be waived. We now turn to address the remaining issues.

## B. Subject-matter jurisdiction

We ordered the parties to brief the issue of whether this Court has jurisdiction to consider this appeal considering the timing of the filing of appeal and the requirements of the Tennessee Rules of Civil Procedure and the Tennessee Rules of Appellate Procedure.

In order to be timely, a notice of appeal "shall be filed with the clerk of the appellate court within 30 days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a). "The thirty-day time limit for filing a notice of appeal is mandatory and jurisdictional in civil cases." *Albert v. Frye*, 145 S.W.3d 526, 528 (Tenn. 2004). Rule 59 of the Tennessee Rules of Civil Procedure, which allows for the filing of a motion to alter or amend, provides: "Motions to reconsider [Rule 59] motions are not authorized and will not operate to extend the time for appellate proceedings." Tenn. R. Civ. P. 59.01.

The trial court entered the final order on June 21, 2019. Mr. Harris then timely filed a motion to alter or amend. The trial court *sua sponte* amended its judgment on January 3, 2020. The trial court then entered its order on Mr. Harris' motion to alter or amend on January 7, 2020. On February 5, 2020, Mr. Harris filed a second motion to alter or amend, which the trial court denied by order entered May 13, 2020. Mr. Harris then filed a notice of appeal on June 11, 2020.

Mr. Harris' second Rule 59 motion was based on the trial court's findings in its amended order and on the trial court's order on Mr. Harris' first Rule 59 motion. Specifically, Mr. Harris argued in his second motion that "[t]he trial court's rational for disgorgement of fees is no longer sustainable after its finding that the fee agreements were valid contracts." This Court has held that when a party files a second Rule 59 motion in response to an amended judgment, the time period for filing the notice of appeal is tolled if the second motion addresses issues raised by the amended decision and is not simply a motion to reconsider previously asserted grounds. *Legens v. Lecornu*, No. W2013-01800-

- 10 -

COA-R3-CV, 2014 WL 2922358, at *13–14 (Tenn. Ct. App. June 26, 2014); ***Davis v. Wells Fargo Home Mortgage***, No. W2016-02278-COA-R3-CV, 2018 WL 1560077, at *3 (Tenn. Ct. App. Mar. 29, 2018). We conclude that Mr. Harris' second Rule 59 motion was not simply a motion to reconsider previously asserted grounds because it addresses issues raised by the amended order; therefore, Mr. Harris' second Rule 59 motion operated to toll the period for filing his notice of appeal. Thus, Mr. Harris' June 11, 2020 notice of appeal was effective to confer jurisdiction this Court with jurisdiction over the appeal.

### C. Breach of fiduciary duty

Mr. Harris asserts that the trial court erred in finding that he breached his fiduciary duty to the McMichaels "by not compiling his billing records contemporaneously." Specifically, he argues:

> The trial court erred in finding that it was necessary for [Mr. Harris] [to] compile his billing contemporaneously. Florida law does not so require. Florida law allows reconstruction of the time billed through notes taken contemporaneously, which is what [Mr. Harris] did.

Mr. Harris' argument mischaracterizes the trial court's findings and ignores the fact that Mr. Harris did not comply with the requirements outlined in the fee agreements. The trial court's amended order notes that,

> [a]lthough Florida imposes no absolute requirement of contemporaneous records, Mr. Harris' fee agreement states that the [McMichaels] would receive a billing statement setting forth time expended in quarter hour increments. This did not happen.

Furthermore, the trial court held that Mr. Harris breached the duty to "be competent, prompt, and diligent . . . [and to] maintain communication with a client concerning the representation." R. Regulating Fla. Bar, Preamble. The Florida Bar recommends that:

> Billing should be done promptly after the work for which the bill is sent is completed, and should be detailed. The client is entitled to know what items are covered by the bill and to have current billing so that the cost of the litigation can be overseen as it progresses.

> ***

> When billing a client, the lawyer should detail the legal services performed in the matter and the expenses incurred for each legal service. The "narrative" statements assist the client in understanding the reason for the amount of the bill.

The Fla. Bar, *Florida Civil Practice Before Trial*, ch.3 (13th ed. 2020), *available at* Westlaw CIVPRAC FL-CLE 1-1.

Contrary to Mr. Harris' assertion, the trial court did not hold that Mr. Harris breached his fiduciary duty due to his failure to abide by any Florida rule that required contemporaneous billing; rather, the court held "that [Mr. Harris'] failure to comply with the provisions of **his fee agreement** was a breach of his duty under the rules of professional conduct." (Emphasis added). We agree. All three fee agreements provide, "Time billed shall be in increments of one quarter of an hour." The Florida Supreme Court has stated that "although there is no fixed construction of the word 'shall,' it is normally meant to be mandatory in nature." *Allstate Ins. Co. v. Orthopedic Specialists*, 212 So. 3d 973, 978 (Fla. 2017) (quoting *S.R. v. State*, 346 So.2d 1018, 1019 (Fla. 1977)) (brackets omitted).[4] Nothing in the parties' agreements indicates that this Court should construe the word "shall" contrary to its normal usage. In his brief, Mr. Harris argues that he "did provide billing in quarter hour increments.[,] [a]lthough such billing was not contemporaneous[.]" It is true that, in addition to several "skinny bills," the record contains three detailed billing statements that bill in quarter-hour increments: the first covers the period of February 26, 2014 through March 6, 2014; the second covers the period of March 7, 2014 through May 27, 2014; and the third covers the period of June 4, 2014 through August 7, 2014. At the September 2018 hearing, Mr. Harris testified that he: (1) prepared these statements just prior to the hearing; (2) had not submitted them when he sent the "skinny bills" to the McMichaels; and (3) submitted the detailed bills to the McMichaels shortly before the hearing. This belated and ad hoc compliance with the billing provisions of the parties' agreements simply does not reflect the promptness, diligence or appropriate communication required of a Florida attorney, or any other attorney. We conclude that the trial court did not err in holding that Mr. Harris' failure to comply with the terms of his fee agreement constitute a breach of the fiduciary duty he owed to the McMichaels.[5]

---

[4] The trial court applied Florida's substantive law to this dispute. This decision was correct because there is no choice of law provision in the parties' agreements, the contracts were executed in Florida, and the place of performance was Florida. *See Williams v. Smith*, 465 S.W.3d 150, 153 (Tenn. Ct. App. 2014) ("Tennessee follows the rule of *lex loci contractus*[,] [which] provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent."); *Edgington v. Edgington*, 162 S.W.2d 1082, 1086 (Tenn. 1942) ("[W]here there is nothing to show that the parties had in view, in respect to the execution of the contract, any other law than the law of the place of performance, that law must determine the rights of the parties."). We apply Tennessee's procedural law, which includes the standard of review. *See Boswell v. RFD-TV the Theater, LLC*, 498 S.W.3d 550, 556–7 (Tenn. Ct. App. 2016). Neither party raised a choice of law issue on appeal.

[5] The trial court also concluded that Mr. Harris breached his fiduciary duty in other respects: for example, the duty to "provide competent representation to a client[,] . . . [which] requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." R. Regulating Fla. Bar 4-1.1. Mr. Harris does not raise any issue concerning these additional findings, and we will not address them on appeal.

**D. Disgorgement of attorney fees**

Mr. Harris asserts that the trial court abused its discretion by ordering disgorgement of attorney fees. In its Amended Order, the trial court ordered that Mr. Harris "is disgorged of all fee charges" to the McMichaels. The trial court reconsidered this remedy in its Order on Motion to Alter or Amend, filed January 7, 2020, wherein it held that although "the fee agreements are vague and ambiguous as to the work to be performed by the attorney for the fees charged and that [Mr. Harris] failed to meet his obligations as an attorney," he was entitled to some of his fees because he "did attend some hearings, was somewhat prepared for some of them, did correspond with opposing counsel and the [McMichaels], and should be compensated for some of his time." However, the trial court gave "very little weight" to Mr. Harris' testimony with respect to "whether the amounts [he] charged accurately reflect the work performed, [6] [and] . . . . [t]here is no way for the court to make such a finding based on the weight of the evidence." Therefore, the trial allowed Mr. Harris to retain five thousand dollars but disgorged him of all other payments received from the McMichaels.

Disgorgement is an equitable remedy. *See* **King Mountain Condo. Ass'n v. Gundlach**, 425 So. 2d 569, 572 (Fla. Dist. Ct. App. 1982). As such, our review is limited to whether the trial court abused its discretion in granting or denying disgorgement. *See* **Morrow**, 165 S.W.3d at 258. The abuse of discretion standard "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives." **Lee Med., Inc.**, 312 S.W.3d at 524. Thus, there is a lower likelihood of reversal of discretionary decisions on appeal. **Id.** Indeed, the Tennessee Supreme Court has directed that we "allow discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness." **Tatham v. Bridgestone Americas Holding, Inc.**, 473 S.W.3d 734, 743 (Tenn. 2015). A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." **Eldridge v. Eldridge**, 42 S.W.3d 82, 85 (Tenn. 2001) (quotation marks and brackets omitted). With these principles in mind, we turn to the issue.

The trial court considered the testimony of two expert witnesses. Mr. Harris called Florida attorney Nancy Lynn Hartjen.[7] The trial court found her credible but did not find

---

[6] "The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary." **Duke v. Duke**, 563 S.W.3d 885, 894 (Tenn. Ct. App. 2018) (citing **Morrison v. Allen**, 338 S.W.3d 417, 426 (Tenn. 2011)). This includes such determinations as are "implicit in its holdings." **Williams v. City of Burns**, 465 S.W.3d 96, 120 (Tenn. 2015). We have identified no evidence—and certainly not clear and convincing evidence—in the instant case that the trial court's credibility determinations were in error.

[7] Her surname also appears as "Harchin" in the record. For purposes of this appeal, we will use "Hartjen," with apologies if this is the incorrect spelling.

- 13 -

her testimony of much aid due to her limited experience. Notably, however, the Statement of Evidence reveals that Ms. Hartjen testified that "the retainer agreements were vague, and [that] she could see how they could be confusing as to when the representation ended." Ms. Hartjen further testified that "the statements that [Mr. Harris] gave to her conflicted with other statements." The McMichaels called University of Tennessee College of Law Professor Paula Schaefer, whom the trial court qualified as an expert in the area of legal ethics. Professor Schaefer testified that: (1) an attorney has the ethical obligation to "make sure that their fee agreements are fair, fully explained, and easily understandable"; (2) "liens must be fair and explained to the client, and there is a presumption that they are voidable"; and (3) "[n]on-refundable retainers still must be earned and are therefore problematic." Professor Schaefer opined that Mr. Harris breached his fiduciary duty to his clients. The trial court found "this witness to be the most credible of all of the witnesses as she had no financial interest in the outcome of case as well as [due to] her credential[s]."

The trial court also based its disgorgement decision on the following factual findings:

[Mr. Harris] failed to follow the most basic of terms of his own agreement by failing to keep a record of his time and provide that record to his clients to account for the time he spent in his representation of them as was set out in the retainer agreement that he authored. He did not explain what he meant in the Agreement by "limited appearance." His fee agreements are vague according to the testimony of his own witness, the [McMicheals'] expert witness . . . , and in the opinion of this Court, thus creating confusion between himself and his clients. He further failed to put his clients' needs before his own by demanding additional payments close to deadlines or due dates or close to the time of a court appearance. Additionally, he took advantage of his clients' situation by changing the fee agreement, demanding more money, and never justifying the work he had performed even though he promised that he would supply [the] documents [that] he [had] produced and a "plan of attack." [Mr. Harris] was in a superior position which put his clients in an extremely difficult position considering all the surrounding circumstances. . . .

[Mr. Harris] waited for deadlines to be close, at which time he demanded additional funds and promised, but never fully delivered, the representation that he convinced [the McMichaels] that [he] could perform. This created a situation for [the McMichaels] that put them in an unmanageable position after already having been put in a problematic position by [their previous counsel].

The trial court found credible the McMichaels' testimony that they were pressured into signing the second and third agreements due to Mr. Harris' unwillingness to speak to

them about their case until they signed. Accordingly, the court held that the McMichaels "were coerced as a result of the unethical conduct of [Mr. Harris]." The trial court further concluded that Mr. Harris did not comply with the duties imposed by the Rules of Professional Conduct to represent clients with the "thoroughness and preparation reasonably necessary for the representation" and to "make reasonable efforts to ensure that the client . . . possesses information reasonably adequate to make an informed decision." *See* R. Regulating Fla. Bar, Rule 4-1.1 and Preamble, Comments. Based on the available evidence, we conclude that the trial court's findings are supported by the evidence and are not otherwise contrary to logic or reasoning. *See **Eldridge***, 42 S.W.3d at 85.

Under Florida law, when a fiduciary commits a breach of his or her duty, "the beneficiary can obtain redress either at law or in equity for the harm done[,] [or]. . . . is entitled to obtain the benefits derived by the fiduciary through the breach of duty," *i.e.*, disgorgement. ***King Mountain Condo. Ass'n***, 425 So. 2d at 571 (citing Restatement of Restitution § 138 cmt a (Am. Law Inst. 1937); Restatement (Second) of Torts § 874 cmt b (Am. Law Inst. 1979)). Although the trial court recognized that Mr. Harris completed some work on behalf of the McMichaels, it ultimately concluded that

> there was no competent evidence of what [Mr. Harris] did in this case based on all of the circumstances surrounding this matter: specifically, that [Mr. Harris] failed or refused to comply with his own contract and supply a breakdown of his "skinny bill" until some 4 years after suit was brought in this matter.

The trial court's equitable solution was to allow Mr. Harris $5,000, the amount contemplated in the First Agreement, and to disgorge him of the remainder of the fees paid him. Under the specific facts of this case, the trial court's decision constitutes an acceptable resolution, *see **Lee Med., Inc.***, 312 S.W.3d at 524; as such, we conclude that the trial court did not abuse its discretion or otherwise err in allowing Mr. Harris to retain only $5,000.00.

### E. Lisa McMichael

Finally, Mr. Harris asserts that "the trial court err[ed] in ordering that [he] disgorge attorney fees to both Gary and Lisa McMichael where [his] agreement was only with Gary McMichael and no evidence was presented at trial that Lisa McMichael directly paid any attorney fees[.]" Mr. Harris argues that because Mrs. McMichael "didn't pay any attorney fees, or even contract to pay attorney fees to [Mr. Harris] there are no demonstrable attorney fees to 'disgorge' to her." The McMichaels maintain that in view of Mr. Harris' joint representation of them, the trial court did not err in ordering the return of the fees to them jointly.

Our review of the record did not yield any evidence that Mr. Harris raised this issue at trial. It is well-settled that issues not raised before the trial court may not be raised for

- 15 -

the first time on appeal. **Baugh v. Novak**, 340 S.W.3d 372, 381 (Tenn. 2011); *see also* Tenn. Ct. App. R. 6(a)(2). However, even allowing, *arguendo*, that the trial court erred in entering judgment for the McMichaels jointly, having concluded, *supra*, that the trial court did not err in disgorging Mr. Harris of fees over $5,000, its decision to award those fees to both appellees was, at most, harmless error; as such, the joint award does not constitute reversible error.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. The case is remanded to the trial court for further proceedings as may be necessary and are consistent with this opinion. Costs of this appeal are assessed to the Appellant, W. Douglas Harris, for which execution may issue if necessary.


s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE